NO. 07-04-0281-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



JULY 16, 2004



______________________________




ROKE ACOSTA, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 242ND DISTRICT COURT OF SWISHER COUNTY;



NO. B3798-0307; HONORABLE ED SELF, JUDGE



_______________________________



Before QUINN and REAVIS and CAMPBELL, JJ.

ORDER OF ABATEMENT AND REMAND


 Appellant Roke Acosta perfected appeal from his felony conviction in cause number
B3798-0307 in the 242nd District Court of Swisher County on May 12, 2004. The clerk's 
record was filed in this court June 14, 2004. It includes an Affidavit of Inability to Employ
Counsel on Appeal and Inability to Pay or Give Security for Clerk's Record and Reporter's
Record. The record does not reflect any contest to the affidavit or an order from the trial
court determining appellant's indigence or appointing counsel on appeal.

Reporter's Record

 The official court reporter has filed an unsigned request for extension of time to file
the reporter's record. The extension is sought because appellant has failed to submit a
written request for preparation of the reporter's record, see Tex. R. App. P. 34.6(b), and
because appellant has not paid or made arrangements to pay for the record. The official
reporter requests an extension until "30 days after payment." Because appellant has
requested a free record and filed an affidavit of indigence, his obligation to pay for
preparation of the appellate record is governed by Rule of Appellate Procedure 20.2. That
rule requires a hearing and ruling by the trial court on appellant's request to determine his
obligation to pay for the record on appeal. That rule further provides the trial court must
order the reporter to transcribe the proceedings if the court finds appellant is entitled to an
appellate record without charge. Finally, the rule provides that the reporter shall be paid
from general funds of the county when the trial court certifies that the record has been
furnished. The reporter's request for extension until "30 days after payment" will not be
appropriate, therefore, if the trial court determines appellant is entitled to a record without
charge. Tex. R. App. P. 20.2. Pending the trial court's determination of that matter, the
due date for filing the reporter's record is extended to Friday, August 27, 2004.



Counsel on Appeal

 In Texas every person convicted of a crime has a statutory right to appeal. See Tex.
Code Crim. Proc. Ann. art. 44.02 (Vernon 1979); Monreal v. State, 99 S.W.3d 615, 617
(Tex.Crim.App. 2003). The right of an accused in a criminal proceeding to the assistance
of counsel is guaranteed by the Constitutions of the United States and of Texas. U.S.
Const. amend. VI; Tex. Const. art. I, §10; Ex parte Prejean, 625 S.W.2d 731, 733
(Tex.Crim.App. 1981). That right extends to appeal. Gideon v. Wainwright, 372 U.S. 335,
344, 83 S.Ct. 792, 796-97, 9 L.Ed.2d 799 (1963); Buntion v. Harmon, 827 S.W.2d 945, 948
(Tex.Crim.App. 1992). In Texas, the trial court has been assigned the responsibility of
appointing appellate counsel for eligible indigent defendants. See Tex. Code Crim. Proc.
Ann. art. 1.051(d)(1), 26.04(a) (Vernon 1979). 

 The failure to determine appellant's entitlement to appointed counsel on his proper
request requires the abatement of this appeal and remand to the trial court. Tex. R. App.
P. 43.6. Upon remand the trial court judge is directed to cause notice to be given of, and
to conduct, a hearing to determine: (1) whether appellant desires to prosecute this appeal;
(2) if so, whether appellant is indigent; (3) if appellant is indigent, whether counsel should
be appointed; and (4) what orders, if any, should be rendered to ensure the filing of
appropriate notices and documentation to dismiss appellant's appeal if he does not desire
to prosecute the appeal, or, if appellant desires to prosecute this appeal, to assure that the
appeal will be diligently pursued. 

 The trial court is directed to (1) make and file any necessary and appropriate
findings, conclusions and orders, and cause them to be included in a supplemental clerk's
record; and (2) cause the hearing to be transcribed and included in a reporter's record. In
the absence of a request for extension of time from the trial court, the supplemental clerk's
record and reporter's record of the hearing are to be filed no later than August 16, 2004.


 Per Curiam

Do not publish. 



 allegations and Dr. Kellogg's
medical report was forwarded to him. Stoeckle interviewed both J.M. and Mrs. McCann. On
June 2, 2004, an indictment was filed and a warrant was issued. On October 20, 2004,
Appellant was arrested in Florida. 

 Issue One - Factual Sufficiency


 By his first issue, Appellant maintains the evidence is factually insufficient to support his
conviction as to each offense. We disagree. When conducting a factual sufficiency review,
we examine all the evidence in a neutral light and determine whether the jury was rationally
justified in finding guilt beyond a reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484
(Tex.Crim.App. 2004), overruled in part by Watson v. State, 204 S.W.3d 404, 415-17
(Tex.Crim.App. 2006). We cannot reverse a conviction unless we find some objective basis
in the record that demonstrates that the great weight and preponderance of the evidence
contradicts the jury's verdict. Watson, 204 S.W.3d at 417. In other words, we cannot conclude
that Appellant's conviction is "clearly wrong" or "manifestly unjust" simply because we disagree
with the jury's verdict. Id.; Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997). 

 The jury is the exclusive judge of the facts. Tex. Code Crim. Proc. Ann. art. 36.13
(Vernon 2007) & 38.04 (Vernon 1979). As a reviewing court, we must always remain cognizant
of the jury's role and unique position in evaluating credibility and demeanor of witnesses and
giving weight to contradictory testimonial evidence. Johnson v. State, 23 S.W.3d 1, 8-9
(Tex.Crim.App. 2000). Unless the record clearly demonstrates a different result is appropriate,
we must defer to the jury's determination. Id. at 8.

 The gist of Appellant's factual sufficiency argument is that J.M.'s allegations were
unreliable and uncorroborated by any independent evidence. Based on that premise, he
asserts the jury's verdict is objectively against the great weight and preponderance of the
evidence. As directed by the Texas Court of Criminal Appeals, we must consider the most
important evidence that Appellant claims undermines the jury's verdict. Sims v. State, 99
S.W.3d 600, 603 (Tex.Crim.App. 2003). 

 The defense portrayed J.M. as an intelligent, manipulative, vengeful, liar who fabricated
the allegations against Appellant because he was a strict disciplinarian. Much was made about
an incident involving J.M. while she was in fifth grade. J.M. testified that her teacher caught her
passing a note, and because she was upset she left school without notifying anyone. When
she was eventually located, J.M. claimed to have been abducted from the school bathroom by
a man at gunpoint. During her testimony at trial, J.M. admitted fabricating the abduction story. 

 The defense also introduced a handwritten note that was alleged to have been written
by J.M. The note recites that when J.M. was thirteen, she was given a "roofie" and blacked out. 
The note further provides that while she was under the influence of this drug she was gang
raped, and that as a result, she became pregnant and eventually went to Mexico for an
abortion. J.M. testified that the note looked like it was in her handwriting but she could not
recall writing the note, nor did she remember ever discussing it with her therapist. J.M. also
denied that the events described in the note ever happened. 

 Further evidence showed that J.M. and her family always lived in small residences or
apartments. J.M. testified that at times she had her own bedroom, while the defense presented
evidence that all four siblings shared one bedroom. The house at 119 Gardina, where the
family resided for almost five years, was a small two-bedroom residence that Appellant
described as a "match box." J.M. testified that she had her own bedroom and that Appellant
would come in at night and sexually abuse her. According to Appellant, Mrs. McCann, and the
two brothers who testified, all four siblings slept in one bedroom and the younger brother slept
on the floor near J.M. The defense also offered testimony that it was unlikely Appellant
committed the alleged offenses because two of J.M.'s brothers were light sleepers who would
have heard Appellant on the creaky floors if he had come into their bedroom at night. 

 Several witnesses testified that all four siblings did everything together and that
Appellant never asked his sons to play outside or go to the park so he could find opportunities
to be alone with J.M. J.M., on the other hand, testified that on several occasions, Appellant
asked her brothers to go to the park or go play outside so he could be alone with her.

 J.M. described the abuse as beginning when she was approximately seven and lasting
until she was approximately fourteen. She testified that while living at the residence on
Gardina, Appellant came into her room holding a beer bottle, unzipped his pants, pulled out his
penis, and asked her to "lick his balls." She recalled putting her mouth on it. She also testified
that while living at the same address, he had anal sex with her, which caused her pain and
bleeding. She said that Appellant applied Vaseline on his penis before anal penetration. 
According to J.M., on one occasion, Appellant had her bring coffee into his bedroom and asked
her to get naked. He then touched her everywhere--breasts, butt, and vagina. She continued
in her testimony that Appellant had her touch his penis and perform oral sex on him and that
while still residing at the Gardina address, and that Appellant put his mouth on her vagina while
they were watching a movie. 

 J.M. testified that Appellant would ejaculate into a towel and sometimes on her legs,
which she would wipe off with a towel. According to J.M., Appellant told her he could not
ejaculate inside her because she might become pregnant. Mrs. McCann testified that she did
all the laundry for the family and never noticed any stained towels or any bloody underwear. 
Neither did she notice any tissues with blood or body fluids. 

 According to J.M.'s testimony, Appellant groomed her to believe he loved her and that
the incidents were their secret. J.M. also testified that Appellant told her that ancient
civilizations engaged in such conduct and that society had turned it into a "bad thing" and that
if she revealed their relationship, the family would be separated and her parents would go to
jail.

 J.M. further testified that when she was thirteen and the family was living at Sage
Crossing Apartments, Appellant forced her to have vaginal intercourse. She testified that after
the first incident of intercourse, future encounters included vaginal intercourse. In 2001, the
family moved from Sage Crossing Apartments to a motel for some months. She testified that
Appellant touched her breasts and "private parts" with his fingers. Vaginal and anal sex also
occurred while living at the motel. The family then moved to a house on Alametos, where the
last incident occurred in mid-August 2002.

 Appellant testified that J.M. was intelligent, head strong, and demanding. He
emphatically denied J.M.'s allegations. He explained that his busy work schedule of twelve to
eighteen hour days did not leave him much free time. According to Appellant, while he and
Mrs. McCann were separated, J.M. had no limitations on privileges and was "boy crazy." 
Appellant also testified that subsequent to the allegations of sexual abuse having been made,
J.M. apologized to him and said she had acted out of anger.

 Detective Stoeckle testified that except for J.M.'s allegations, he found no other
independent evidence of sexual abuse. Dr. Kellogg testified that her diagnosis was that J.M.
had been sexually abused. During Dr. Kellogg's cross-examination, the defense attempted to
impeach her with a prior case in which she had testified to one theory and later found out her
testimony was inaccurate. The defense then proceeded with a line of questioning indicating
that a computer literate person would have been able to obtain information about the symptoms
of sexual abuse on the internet. 

 J.M. was recalled as a witness and testified that Mrs. McCann began working full time
when she was in second or third grade. She further testified that Appellant went through
periods of unemployment, which caused financial hardships. She also claimed that when she
and her brothers were younger, Appellant would spend more time at home during the summer
months because the children did not have a babysitter. Mrs. McCann was also recalled and,
contrary to J.M.'s testimony, testified that Appellant did not have periods of unemployment. In
response to defense counsel's questions, she denied that Appellant spent time at home just
"doing nothing." 

 During her initial testimony, Mrs. McCann admitted crying and holding her head in her
hands when she first learned of J.M.'s allegations; however, she told the CPS interviewer that
she did not believe the allegations. Briones testified that Mrs. McCann believed she had failed
her daughter when she heard the audiotape of J.M.'s allegations. 

 As outlined hereinabove, this record is fraught with contradictory testimony. We must,
however, give great deference to the jury's resolution of those conflicts. As the exclusive judge
of the facts and credibility of the witnesses, the jury was free to believe or disbelieve all or any
part of a witness's testimony. Goodman v. State, 66 S.W.3d 283, 287 (Tex.Crim.App. 2001). 
The jury performed its task of weighing the evidence, resolving conflicts in the testimony, and
thereafter chose to give credibility to J.M.'s allegations and disbelieve the witnesses for the
defense. Given the record before us, we conclude the jury was rationally justified in finding guilt
beyond a reasonable doubt. We find no objective basis in the record that demonstrates that
the great weight and preponderance of the evidence contradicts the jury's verdict. Issue one
is overruled.

Issues Two and Three - State's Election 

 By his second and third issues, Appellant asserts he was egregiously harmed by the trial
court's failure to charge the jury in terms that made the State's election binding on it as to the
facts alleged to support each count of the indictment and in such a way that each conviction
was based upon specific illegal conduct. We disagree. 

 When the State charges multiple offenses in a single indictment, it is required by statute
to set out each offense in a separate "count." See Tex. Code Crim. Proc. Ann. art. 21.24(a)
(Vernon 1989). See also Martinez v. State, 225 S.W.3d 550, 554 (Tex.Crim.App. 2007). When
the State has offered multiple instances of conduct that might conform to a single count, the
State may be required to make an election as to which particular evidentiary facts it is relying
upon to support a conviction as to each count alleged in the indictment. Martinez, 225 S.W.3d
at 555. The reasons for requiring the State to make an election are:

 (1) to protect the accused from the introduction of extraneous
offenses;

 (2) to minimize the risk that the jury might choose to convict, not
because one or more crimes were proved beyond a reasonable
doubt, but because all of them together convinced the jury the
defendant was guilty;

 (3) to ensure unanimous verdicts, that is, all of the jurors agreeing
that one specific incident, which constituted the offense charged
in the indictment, occurred; and

 (4) to give the defendant notice of the particular offense the State
intends to rely upon for prosecution and afford the defendant an
opportunity to defend.


Phillips v. State, 201 S.W.2d 731, 733 (Tex.Crim.App. 2006).

 

 In this case the seven count indictment provides, in relevant part, as follows:


COUNT I


 JAMES MCCANN . . . did then and there intentionally and knowingly cause the
SEXUAL ORGAN of [J.M.] . . . to CONTACT the SEXUAL ORGAN of THE SAID
DEFENDANT.

COUNT II


 JAMES MCCANN . . . did then and there intentionally and knowingly cause the
ANUS of [J.M.] to CONTACT the SEXUAL ORGAN of THE SAID DEFENDANT.


COUNT III 


 JAMES MCCANN . . . did then and there intentionally and knowingly cause the
MOUTH of [J.M.] to CONTACT the SEXUAL ORGAN of THE SAID
DEFENDANT.

COUNT IV


 JAMES MCCANN . . . did then and there intentionally and knowingly cause the
SEXUAL ORGAN of [J.M.] to CONTACT the MOUTH of THE SAID
DEFENDANT.

COUNT V


 JAMES MCCANN . . . did then and there intentionally and knowingly engage in
sexual contact with [J.M.] . . . by then and there TOUCHING PART OF THE
GENITALS of [J.M.] with the intent to arouse and gratify the sexual desire of any
person.

COUNT VI


 JAMES MCCANN . . . did then and there intentionally and knowingly engage in
sexual contact with [J.M.] . . . by then and there TOUCHING THE ANUS of [J.M.]
with the intent to arouse and gratify the sexual desire of any person.

COUNT VII


 JAMES MCCANN . . . did then and there intentionally and knowingly engage in
sexual contact with [J.M.] . . . by then and there causing [J.M.] to touch PART
OF THE GENITALS OF THE SAID DEFENDANT, with the intent to arouse and
gratify the sexual desire of any person . . . .


 Each count alleges that the offense occurred "on or about" August 14, 2002. Appellant
contends that the application paragraphs of the jury charge, which simply mirrored the
indictment, did not provide the jury with any particulars to identify the specific incidents. Relying
on Dixon v. State, 171 S.W.3d 432, 434 n.1 (Tex.App.-Houston [14th Dist.] 2005), rev'd on
other grounds, 201 S.W.3d 731 (Tex.Crim.App. 2006), Appellant maintains that an election is
ineffective if it is not incorporated into the jury charge. 

 In this case the trial court required the State to make an election outside the jury's
presence. The State went over each count and explained the evidence it intended to rely upon
to support a conviction as to each count. During the charge conference, defense counsel
expressed concern about tying specific evidence to the individual counts, to which the trial court
explained:

 The Court: Well, the State has made its election, and under this
Charge, the way I read it the State is the one that has the
burden of telling them what we are talking about on each
of these, not you.


 [Defense Counsel]: Okay. Yeah, that is a good explanation.

 The Court: You like that explanation?

 [Defense Counsel]: I love it.

 The Court: Is the State okay with the Charge?

 [Prosecutor]: Yes, Your Honor.

 The Court: Is the defense okay with the Charge?

 [Defense counsel]: Yes.


Thereafter, the trial court instructed the jury as follows: 



 The State has identified the specific instances on which it is relying to
substantiate the allegations in the Indictment. . . . [Y]ou must focus upon the act
or acts identified by the State as allegedly supporting each such count, and you
may find the defendant guilty of any particular count only if you unanimously
agree beyond a reasonable doubt that the act or acts relied upon by the State
did occur, and that those acts prove the offense alleged beyond a reasonable
doubt. 


 Appellant acknowledges that trial counsel did not object to the charge. Thus, in order
to sustain a reversal, we must find that any error was "egregious." Almanza v. State, 686
S.W.2d 157, 171 (Tex.Crim.App. 1984). Almanza defines egregious harm as errors which
affect "the very basis of the case," deprive the defendant of a "valuable right," or "vitally affect
a defensive theory." Id. at 172 (citations omitted); Hutch v. State, 922 S.W.2d 166, 172
(Tex.Crim.App. 1996). The degree of harm may be determined in light of the entire jury
charge, the state of the evidence, including the contested issues and the weight of the
probative evidence, the arguments of counsel, and any other relevant information in the record.
Almanza, 686 S.W.2d at 171.

 During closing arguments, as directed by the trial court, the State specified the following
evidence it was relying on for each of the seven counts: 


 Count I: J.M. testified that when she was thirteen, Appellant forced
vaginal intercourse on her when the family was living at Sage Crossing
Apartments. The act occurred on the carpet by the balcony.
 Count II: J.M. testified that while living at 119 Gardina, Appellant applied
Vaseline to his penis and penetrated her anus. 
 Count III: J.M. testified that her first memory of the assaults was when
she was seven and was living at 119 Gardina. Appellant had her "lick his
balls" and her mouth made contact with his penis.
 Count IV: J.M. testified that Appellant performed oral sex on her while
they were watching the movie "Cruel Intentions."
 Count V: J.M. testified that while the family was living at a motel,
Appellant sent her brothers outside and touched her breasts and genitals
with his fingers.
 Count VI: J.M. testified that while living at 119 Gardina, Appellant touched
her anus when she brought coffee into his bedroom.
 Count VII: J.M. testified that on the same occasion as in Count VI, she
touched Appellant's genitals.



 We first address Appellant's concern that while all seven counts allege the same date
of August 14, 2002, the State's election of evidence clearly contemplated different dates. The
State is not required to allege a specific date in an indictment. When an indictment alleges that
a crime occurred "on or about" a particular date, the State can rely upon evidence that an
offense occurred on a date other than the one specifically alleged in the indictment, so long as
the date is anterior to the presentment of the indictment and within the statutory limitations
period, and the offense relied upon otherwise meets the description of the charged offense. 
Yzaguirre v. State, 957 S.W.2d 38, 39 (Tex.Crim.App. 1997), citing Sledge v. State, 953
S.W.2d 253, 256 (Tex.Crim.App. 1997). 

 In this case, J.M. testified that the last incident of abuse happened in August 2002. The
indictment was presented to the Grand Jury on June 2, 2004. (1) The statute of limitations for
both aggravated sexual assault and indecency with a child is ten years from the eighteenth
birthday of the victim. Tex. Code Crim. Proc. Ann. art. 12.01(5) (Vernon Supp. 2006). 
Therefore, there is no error in the State alleging that all counts occurred "on or about August
14, 2002." 

 Appellant further complains that the charge of the court did not contain an application
paragraph tracking the State's election. Appellant does not provide any persuasive authority
for his contention that the trial court is required to incorporate the State's election into the jury
charge. Appellant's reliance upon Dixon is misplaced. In Dixon the trial court erred by not
requiring the State to make an election, whereas, here the trial court did require the State to
make an election. Appellant's complaint is that the trial court did not incorporate that election
into the application paragraph of the court's charge. Assuming the trial court was required to
do so, we conclude under the facts of the this case and in light of the entire jury charge, the
state of the evidence, including the contested issues and the weight of the probative evidence,
and the arguments of counsel, that Appellant did not suffer egregious harm. The State made
its election and then pursuant to the trial court's request, in their closing arguments specifically
outlined to the jury the evidence it was relying on as to each count. Under these
circumstances, we cannot say that the error, if any, caused Appellant any egregious harm. 
Issues two and three are overruled. 

 Consequently, the trial court's judgment is affirmed.


 Patrick A. Pirtle

 Justice


 

Do not publish. 
1. The date portion of the indictment was left blank; however, upon the State's request,
the trial court took judicial notice of the date of the indictment as being June 2, 2004.